# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOYCE A. MILLER, | ) | |
| | ) | Civil Action No. 06-937 |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| UNIVERSITY OF PITTSBURGH | ) | |
| MEDICAL CENTER, MCKEESPORT, | ) | |
| | ) | |
| Defendant | ) | |

## **MEMORANDUM OPINION**

Pending before this court is a motion for summary judgment (Docket No. 23) filed by defendant UPMC McKeesport ("UPMC" or "defendant"), improperly named in the caption. Plaintiff Joyce A. Miller ("Miller" or "plaintiff") filed this civil action asserting claims for discrimination, failure to accommodate, and retaliation under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112 *et seq.* and the Pennsylvania Human Relations Act ("PHRA"), 43 PA. CONS. STAT. § 955; for interference and retaliation under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*; and for violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 202 *et seq.*, the Pennsylvania Minimum Wage Act ("PMWA"), 43 PA. CONS. STAT. § 333.101 *et seq.*, and the Pennsylvania Wage Payment and Collection Law ("WPCL"), 43 PA. CONS. STAT. § 260.1 *et seq.* Plaintiff asserts that defendant terminated her with discriminatory and retaliatory motive because of her asserted disability and for engaging in statutorily protected behavior. Plaintiff also argues that defendant illegally took deductions from one of her paychecks, paying her below the federal and state minimum wages for that pay period.

After reviewing the record, viewing all disputed facts in plaintiff's favor and drawing all reasonable inferences in plaintiff's favor, the court grants defendant's motion for summary judgment with respect to plaintiff's claims under the ADA, the PHRA, the FMLA, and the FLSA. The court denies defendant's motion for summary judgment with respect to plaintiff's claims under the PMWA and the WPCL. Because summary judgment will be granted in favor of defendant with respect to the federal claims, the court will decline to exercise supplemental jurisdiction over the state law claims and will dismiss those claims without prejudice.

### *Factual Background*

#### Plaintiff's employment

In 1991, plaintiff was hired by defendant as a surgical technologist. (Joint Statement of Material Facts ("J.S.") ¶ 1.) Defendant's job description of the surgical technologist position read in relevant part:

> Responsibilities: . . . Take calls and work shifts as required. . . . The above statement reflects the general details considered necessary to describe the principal functions of the job identified, and shall not be construed as a detailed description of all of the work requirements that may be inherent in the job . . . .

(Declaration of Robin Lane of February 4, 2008 ("Lane Dec.") Ex. A.) Robin Lane ("Lane"), director of surgical services and plaintiff's supervisor, described attendance and taking call as "essential function[s]" of the surgical technologist position. (Id. ¶¶ 6, 8.)

Defendant had policies in place governing employee absences and days off and the disciplinary procedure that would be applied to employee absences. (Declaration of James W. Carroll, Jr. ("Carroll Dec.") Ex. 1; Deposition of Donna Skundrich ("Skundrich Dep.") Ex. 1.) Defendant's Staff Handbook provided that employees were permitted eight sick days and two

personal days per year, along with other kinds of approved leave and holidays.  (Carroll Dec. Ex.

1.)  Defendant had an absence and tardiness policy that required regular attendance.  (Skundrich

Dep. Ex. 1.)  The absence and tardiness policy defined an excessive absence as any seven or

more days of absence within a twelve-month period.  (J.S. ¶ 26.)  Under the absence and

tardiness policy, an employee having excessive absences would be treated according to

defendant's corrective action and discharge policy as follows:

- The first violation, seven absences within a twelve-month period, would be treated with a verbal warning from the employee's supervisor. (Skundrich Dep. Ex. 1.)
- The second violation, eight absences within a twelve-month period, would be treated with a written warning with the completion of an employee conference report.
  (Id.)
- The third violation, nine absences within a twelve-month period, would be treated with a second employee conference report and a three-day suspension for the employee.
  (Id.)
- The ultimate level of discipline provided:

> Upon the employee's return to work following a suspension, an additional violation will result in a five (5) day suspension pending termination documented with a Conference Report.  Based on a recommendation from the Department Head, a review of the reason for the absence, and the employee's overall performance, a determination will be made regarding the future status of the employee.

(Id.)

**Plaintiff's medical history**

In May 1996 and again in November 1998, plaintiff was exposed to Hepatitis C in the

course of her employment.  (J.S. ¶ 74.)  As a result of these exposures, plaintiff was infected with

Hepatitis C, and in 1998, was diagnosed with chronic Hepatitis C.  (Id.)  From the beginning of

1999 through April 30, 2000, from September 9, 2001, through May 12, 2003, and from February 21, 2004, through November 11, 2004, plaintiff was off work for three separate courses of interferon-based Hepatitis C treatment.  (Id. ¶ 6.)  The first two of these courses of treatment were unsuccessful.  (Id. ¶ 77.)  In August 2003, plaintiff began her third course of treatment under the care of Drs. Kapil Chopra ("Chopra") and Jawad Ahmad.  (Id. ¶ 8.)  For this third round of treatment, plaintiff was off from work from February 21, 2004, to November 11, 2004. (Id. ¶ 6.)

Plaintiff contends that Hepatitis C and the interferon-based treatments affected her in several ways, including that: (1) Hepatitis C and the interferon-based treatments caused plaintiff fatigue that caused loss of appetite at breakfast and dinner, but not lunch; (2) Hepatitis C and the interferon-based treatments affected her ability to walk, and that she would become fatigued by walking long distances or up stairs and would need to rest at times; (3) her sex life was affected by Hepatitis C for fear of passing the virus to a partner; and (4) her ability to become pregnant was impaired because patients who receive interferon treatment are advised not to become pregnant during the treatment or for six months afterwards.  (Id. ¶¶ 16, 17, 19-21, 23, 78, 80.)  In total, plaintiff had a period of four and one-half years during which she was advised against becoming pregnant.  (Deposition of Kapil Chopra, M.D. ("Chopra Dep.") at 44; Declaration of Joyce A. Miller ("Miller Dec.") ¶¶ 2, 3.)  Patients who are infected with Hepatitis C can possibly transmit the virus to partners during sexual activity, even with the use of a barrier contraceptive. (Chopra Dep. at 34, 63.)

In August 2004, plaintiff's third round of treatment successfully ended, and the Hepatitis C was rendered non-active.[1]  (J.S. ¶¶ 9, 10.)  Plaintiff's appetite improved after the treatment ended so that she could eat at all meal times, and only some days experienced a loss of appetite. (Deposition of Joyce A. Miller ("Miller Dep.") at 36-37.)  Chopra testified that it takes four to six weeks for side of effects of Hepatitis C treatment to completely disappear.  (J.S. ¶ 48.)  Chopra further testified that, in his medical opinion, it is unlikely that the side effects of plaintiff's Hepatitis C treatment lasted beyond her return to work in November 2004.  (J.S. ¶ 50.)  Plaintiff was not as affected by Hepatitis C after the treatment ended.  (J.S. ¶ 18.)

In November 2004, plaintiff was able to return to work, but under the medical restriction that she work not more than forty hours a week, not more than eight hours a day, and that she not take call.  (J.S. ¶ 12; Miller Dep. Ex. 2.)  Plaintiff stated that defendant often inquired about her ability to take call and regularly told her that she needed to improve her attendance.  (J.S. ¶ 24.)

**Plaintiff's performance after her return to work**

After plaintiff returned to work in November 2004, she had several unscheduled absences and called off a number of times.  (Miller Dep. at 144; Miller Dep. Ex. 13.)  The reasons for these unscheduled absences were mostly health related – plaintiff was not feeling well and could not work on those occasions.  (Id.)  Plaintiff had unscheduled absences on the following days: November 23, 2004, December 10, 2004, January 24, 2005, January 25, 2005, February 4, 2005, February 24, 2005, March 3, 2005, March 11, 2005, April, 1, 2005, April 4, 2005, May 19, 2005,

---

[1] Although a patient with undetectable levels of Hepatitis C is considered "cured" for all practical and medical purposes, it is possible for minuscule, undetectable amounts of the virus to remain within the patient.  (Chopra Dep. at 46.)  Even a patient who has been treated and cured of Hepatitis C retains a chance of relapse between zero and two percent, unlike individuals who have not been exposed to Hepatitis C.  (Id. at 47.)

June 27, 2005, August 17, 2005, and November 17, 2005. (Miller Dep. Exs. 13, 19, 20.) When calling off from work, plaintiff would speak to defendant's nursing supervisor on duty who transcribed the reason for the unscheduled absence. (J.S. ¶ 29.) When doing so, plaintiff did not link her absences to Hepatitis C or the interferon treatments, but instead provided more general excuses, such as "not feeling well" and "ill". (Id. ¶ 43.)

On the occasions that plaintiff called off from work, defendant covered for her using other present staff. (Deposition of Robin Lane ("Lane Dep.") at 33-34.) Using other staff resulted in some employees having to work extra weekends in a given time schedule. (Id. at 33-34.) Sometimes defendant would cover plaintiff's surgical technologist position using registered nurses, who are paid at a higher rate than surgical technologists. (Id. at 33-35.) Defendant argues that plaintiff's absences were troublesome because the market for surgical technologists was volatile, leading to a high turnover rate in the operating room. (Id. at 34.) Plaintiff admits the volatility of the surgical technologist market, but otherwise denies that her absences were troublesome for this reason. (J.S. ¶ 32.)

By April 5, 2005, plaintiff had nine unscheduled absences during the preceding twelve-month period.[2] (Id. ¶33.) In accordance with defendant's absence and tardiness policy, plaintiff received a verbal warning for her poor attendance. (Id.) After this verbal warning, plaintiff called Donna Skundrich ("Skundrich"), defendant's manager of employee relations. (Miller Dep. Ex. 14.) Skundrich's notes made after her phone conversation with plaintiff indicate that plaintiff was upset when she was reprimanded. (Id.) Skundrich explained to plaintiff that she

---

[2]Upon close review of the record, it appears that on April 4, 2005, plaintiff was absent for the tenth time within a twelve-month period, as opposed to the ninth time within a twelve-month period.

had to follow the absence and tardiness policy.  (Id.)  Skundrich also told plaintiff that, in the future, if her absences were Hepatitis C-related, she should provide an excuse from a doctor saying so, and then the absences would not be counted against her.  (Id.)  Plaintiff never provided a doctor's excuse which related her absences to Hepatitis C.  (J.S. ¶ 44.)  Plaintiff asserts that she has no recollection of having a phone call with Skundrich and that defendant never told her to provide a doctor's excuse or to relate her absences to Hepatitis C or her treatment.  (Miller Dep. at 204-08.)

On June 1, 2005, plaintiff received a written warning for missing ten days of work in the preceding twelve-month period.[3]  (J.S. ¶ 36.)  On July 6, 2005, plaintiff received a second written warning for having twelve unscheduled absences in the preceding twelve-month period.  (Id. ¶ 37; Miller Dep. Ex. 13.)  On August 18, 2005, plaintiff received a three-day suspension for missing thirteen days of work in the preceding twelve-month period.  (Miller Dep. Ex. 19; Deposition of Robert Caradonna ("Caradonna Dep.") Ex. 12.)  On August 22, 2005, plaintiff submitted a grievance to defendant in response to her suspension, stating, in part, "I would like to believe that working for a Health Institution such as UPMC there would be a grace period with some patients [sic] and compassion."  (Miller Dep. Ex. 3.)  At the time of this three-day suspension, plaintiff claims that she had only been absent from work for a total of eleven days. (Caradonna Dep. Ex. 12.)

On November 17, 2005, plaintiff was absent again and received a five-day suspension. (Miller Dep. Exs. 19, 20.)  On December 1, 2005, a conference report regarding this five-day

---

[3]A review of the record reflects that, on June 1, 2005, plaintiff had missed eleven days of work within the prior twelve-month period.

suspension was completed.  (Id. Ex. 20.)  Plaintiff's five-day suspension began on December 2, 2005.  (Id.)  The five-day suspension subjected plaintiff to a termination because she had missed thirteen days of work in the preceding twelve-month period.  (Id.; Skundrich Dep. Ex. 1.)  At the time of this five-day suspension, plaintiff claims she had only been absent for twelve days. (Caradonna Dep. Ex. 2.)

After plaintiff received her five-day suspension, Skundrich conferred with Lane, who was plaintiff's department head, about plaintiff's possible termination.  (Skundrich Dep. at 28-29.) Lane recommended that plaintiff be terminated.  (Id.)  Both Skundrich and Lane were aware that plaintiff had contracted Hepatitis C.  (J.S. ¶ 76.)  Skundrich also reviewed the reason for plaintiff's November 17, 2005, absence and reviewed plaintiff's overall performance by taking plaintiff's latest employee evaluation into consideration when making the determination to terminate her.  (Skundrich Dep. at 37-38.)  On December 5, 2005, Skundrich informed plaintiff by letter that she was terminated and that her termination was effective December 8, 2005. (Skundrich Dep. Ex. 4.)  The stated reason for plaintiff's termination was absenteeism.  (Id.)

From May 2003 to February 2004, plaintiff worked two days per week and had not worked a total of 1,250 hours until August 2005.  (J.S. ¶¶ 61, 62.)  Plaintiff's only absences that could have been covered by the FMLA were August 17, 2005, and November 17, 2005.  (Id. ¶ 65.)  On those dates, plaintiff respectively reported being "ill" and having "nausea".  (Id. ¶¶ 66, 67.)

**November 2004 paycheck**

During plaintiff's leaves of absence, defendant paid the costs of plaintiff's health insurance, including plaintiff's share of the premiums.  (Id. ¶ 70.)  Upon her return from leave of

absence in 2003, plaintiff became aware that she would have to repay these benefit arrearages. (Id. ¶ 71.) Afterwards, during plaintiff's third leave of absence, plaintiff inquired about "COBRA" and considered changing her health coverage. (Id. ¶ 72.) She determined that coverage under COBRA would be too expensive, and decided to let defendant continue to pay health insurance premiums on her behalf. (Id.)

Plaintiff asserts that she did not know that defendant would recover the cost of plaintiff's health insurance premiums through deductions from her paycheck until the deductions actually were taken. (Miller Dep. at 277-78.) Plaintiff asserts that she never authorized defendant to take deductions from her paycheck. (Miller Dec. ¶ 8.) Defendant asserts that plaintiff implicitly consented to the deductions in view of defendant's company policies. (J.S. ¶ 101.) In November 2004, plaintiff received a paycheck in the amount of $0.00. (Id. ¶ 68.)

**Plaintiff's receipt of SSID benefits**

On February 9, 2002, plaintiff filed an application for Social Security Disability Insurance ("SSDI") benefits. (J.S. ¶ 52.) Plaintiff claimed that she was totally disabled from working and was awarded benefits retroactive to September 4, 2001. (Id. ¶ 53.) In a report of continuing disability submitted to the Social Security Administration, dated May 4, 2004, plaintiff indicated that she continued to be unable to work due to interferon treatments and had been so since September 2002. (Id. ¶ 54.) As of July 25, 2007, plaintiff was still receiving SSDI benefits and had been since December 2005. (Id. ¶ 55.) Plaintiff did not have to reapply for disability benefits after her termination, as she was under a thirty-six month period of extended eligibility. (Id. ¶ 56.)

Plaintiff testified that she was not totally disabled from performing as a surgical technologist at the time of her discharge in December 2005, and at no point believed that she was disabled from performing as a surgical technologist, although she may have been unable to actually take a position as a surgical technologist.  (Id. ¶¶ 58, 59; Miller Dep. at 332-34.)

### *Standard of review*

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted if, drawing all inferences in favor of the nonmoving party, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).  A motion for summary judgment will not be defeated by the mere existence of some disputed facts, but will be defeated when there is a genuine issue of material fact.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party.  Id. at 249.  The court is to draw all reasonable inferences in favor of the nonmoving party. El v. Southeastern Pa. Transp. Auth., 479 F.3d 232, 238 (3d Cir.2007)("In considering the evidence, the court should draw all reasonable inferences against the moving party.").  The United States Court of Appeals for the Third Circuit recently stated:

> [I]f there is a chance that a reasonable factfinder would not accept a moving party's necessary propositions of fact, pre-trial judgment cannot be granted. Specious objections will not, of course, defeat a motion for summary judgment, but real questions about credibility, gaps in the evidence, and doubts as to the sufficiency of the movant's proof, will.

Id.

*Analysis*

## I.  ADA and PHRA[4] claims

### A.  Discrimination claim

The ADA prohibits employers from discriminating "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  In order to establish a prima facie case of discrimination under the ADA, a plaintiff must prove the following:

> (1) [s]he is a disabled person within the meaning of the ADA; (2) [s]he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) [s]he has suffered an otherwise adverse employment decision as a result of the discrimination.

Gaul v. Lucent Technologies, 134 F.3d 576, 580 (3d Cir. 1998) (citing Shiring v. Runyon, 90 F.3d 827, 831 (3d Cir.1996))

### 1.  Plaintiff is a disabled person within the meaning of the ADA

Defendant asserts that plaintiff is not a disabled person within the meaning of the ADA. The ADA defines a "qualified individual with a disability" under the act as a person "with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such person holds or desires."  42 U.S.C. § 1211(8).  The term "disability" is defined under the ADA as: "(a) a physical or mental impairment that substantially

---

[4] Pennsylvania courts interpret the PHRA in accord with the ADA.  Stulz v. Reese Bros., Inc., 835 A.2d 754 (Pa. Super. Ct. 2003); Imler v. Hollidaysburg American Legion Ambulance Serv., 731 A.2d 169 (Pa. Super. Ct. 1999), appeal denied, 743 A.2d 920 (1999).  The PHRA claims will be subject to the same determination made with respect to the ADA claims.

limits one or more of the major life activities of such individual; (b) a record of such an impairment; or (c) being regarded as having such an impairment."  2 U.S.C. § 12102(2).[5]

The United States Supreme Court developed a three-part framework to determine whether a plaintiff has a "disability" under the ADA.  Bragdon v. Abbott, 524 U.S. 624 (1998).  First, courts are to determine whether the plaintiff suffered from a physical or mental impairment.  Id. at 630.  Plaintiff's infection with Hepatitis C and the associated interferon treatments qualify as an impairment.[6]  Second, the court must identify the major life activity upon which the plaintiff relied and "determine whether it constitutes a major life activity under the ADA."  Id. at 632.

---

[5] The PHRA definition of "handicap or disability", 43 PA. CONS. STAT. § 955(a), is "coextensive" to the definition of "disability" under the ADA.  See Fehr v. McLean Packaging Corp., 860 F.Supp. 198, 200 (E.D. Pa. 1994).  Under the PHRA, the term "handicap or disability," with respect to a person, means:

(1) a physical or mental impairment which substantially limits one or more of such person's major life activities;

(2) a record of having such a disability;

(3) being regarded as having such an impairment, but such term does not include current, illegal use of or addiction to a controlled substance, as defined in section 102 of the Controlled Substances Act (Public Law 91-513, 21 U.S.C. § 802)

43 PA. CONS. STAT. § 954(p.1)(1-3).

[6] Pursuant to 29 C.F.R. § 1630.2(h)(1), a "physical or mental impairment" is defined as:

(1) Any physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine; or

(2) Any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.

Finally, the court must inquire whether the plaintiff's impairment "substantially limited" a major life activity identified in step two.  Id.  In order to resolve defendant's pending motion for summary judgment, the court is required to determine steps two and three within the Supreme Court's framework, i.e., whether plaintiff's impairment substantially limited her in a major life activity.

Plaintiff's asserted disability resulted from being infected with Hepatitis C and undergoing the associated interferon treatments.  Plaintiff asserts that, as a result of her medical condition and treatments, she was impaired from becoming pregnant for a period of approximately four and one-half years.  The United States Supreme Court has addressed whether reproduction is a major life activity within the meaning of the ADA.  Id. at 624.  In Bragdon, the plaintiff, who was infected with HIV, was prevented from becoming pregnant because of the high risk of infecting both her partner and her child if she were to have unprotected sexual intercourse and become pregnant.  Id. at 639-41.  There, the Court held that "[r]eproduction and the sexual dynamics surrounding it are central to the life process itself," and that "[r]eproduction falls well within the phrase 'major life activity.'"  Id. at 638.

A woman infected with Hepatitis C bears a risk, similar to a person infected with HIV,  of infecting her partner during sexual intercourse and interferon treatments disabled plaintiff from becoming pregnant.  Patients who undergo interferon-based treatments are advised not to become pregnant during the treatments or for six months thereafter.

Defendant correctly notes that impairments that are temporary and non-chronic cannot be disabilities under the ADA.  "The impairment's impact must . . . be permanent or long term."

<u>Toyota Motor Mfg., Ky., Inc. v. Williams</u>, 534 U.S. 184, 198 (2002).  The Court in <u>Toyota</u> was

interpreting, in part, the provisions of the Code of Federal Regulations:

> (j)(2) The following factors should be considered in determining whether an
> individual is substantially limited in a major life activity:
>
> . . .
>
>> (ii) The duration or expected duration of the impairment; and
>>
>> (iii) The permanent or long term impact, or the expected permanent or
>> long term impact of or resulting from the impairment.

29 C.F.R. §§ 1630.2(j)(ii), (iii).  Plaintiff was disabled from becoming pregnant for a period of

approximately four and one-half years.  A period of four and one-half years is a long-term

duration.  The court must also consider the future duration or expected impact of the impairment.

Although plaintiff's Hepatitis C is in a non-active state, there is a chance, however small, that she

could suffer a relapse and endure all the symptoms of Hepatitis C and its treatment again.  Courts

have acknowledged this potential for the far-reaching impact of Hepatitis C infection and have

found Hepatitis C to qualify as an impairment under the ADA.  <u>See, e.g.</u>, <u>Sussle v. Sirina</u>

<u>Protection Systems Corp.</u>; 269 F.Supp.2d 285 (S.D.N.Y. 2003) (citing <u>Reese v. American Food</u>

<u>Serv.</u>, No. Civ.A. 99-1741, 2000 WL 1470212, *5 (E.D. Pa. Sept. 29, 2000) (observing that

"[t]he condition is generally long-term and can cause serious damage to the liver.") (citing

STEDMAN'S MEDICAL DICTIONARY 784 (26th ed.1995)); <u>see also</u> <u>Downs v. Hawkeye Health</u>

<u>Services, Inc.</u>, 148 F.3d 948, 949 n.2 (8th Cir. 1998) (observing that Hepatitis C "remains in the

blood for years and accounts for a large percentage of cirrhosis, liver failure, and liver cancer

cases" (citing STEDMAN'S MEDICAL DICTIONARY 784 (26th ed.1995)).

The record reflects that plaintiff adduced evidence to establish that, as a result of her infection with Hepatitis C and three courses of interferon-based treatments, she was impaired, long-term, from at least the major life activity of becoming pregnant. This impairment of a major life activity is sufficient to qualify plaintiff's Hepatitis C as a disability under the ADA. It is, therefore, unnecessary for the court to examine plaintiff's other asserted disabilities. Since Skundrich and Lane were aware that plaintiff had suffered from Hepatitis C, plaintiff also had a record of having such disability.

### 2. Plaintiff is not a qualified individual within the meaning of the ADA

Having concluded that plaintiff adduced sufficient evidence of her disability, the court must consider the second element of an ADA discrimination claim - whether she is a "qualified individual" within the meaning of the ADA. The ADA defines a "qualified individual with a disability" as a person "with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). There is a two-part test utilized to determine whether an employee is a "qualified individual with a disability." Gaul, 134 F.3d at 580. The first part of the test requires the court to consider whether "the individual satisfies the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc." Id. (citing 29 C.F.R. pt. 1630, App. at 353-54). Second, the court must determine "whether or not the individual can perform the essential functions of the position held or desired with or without reasonable accommodation." Id. In this case, defendant does not challenge plaintiff's educational background, experience, or skills to perform the position. At issue is plaintiff's ability to perform the essential functions of the surgical technologist position.

15

In order to determine the essential functions of a position, "consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." Deane v. Pocono Med. Ctr., 142 F.3d 138, 146 (3d Cir. 1998). In the instant matter, Lane characterized attendance and taking call as "essential function[s]" of the surgical technologist position. Defendant's written job description of the surgical technologist position lists the abilities to "take calls and work shifts as required" in an enumerated list of ten responsibilities of the surgical technologist position. The job description noted that the enumerated list contains the "principal functions of the job." For purposes of this motion for summary judgment, the court can find no meaningful distinction between defendant's use of the phrase "principal functions" on its job description and the ADA's use of the phrase "essential functions."

After plaintiff returned to work in November 2004, the evidence of record reveals that she was unable to perform either of these two essential functions, i.e., the ability to take calls and work shifts as required. Plaintiff's medical restrictions limited her work schedule. Plaintiff asserts that these restrictions included working no more than eight hours a day, no more than forty hours a week, and not taking call. Plaintiff was absent from work between twelve and thirteen times between November 2004 and December 2005. Viewing the evidence in the light most favorable to plaintiff, these absences were related to plaintiff's asserted disability. Plaintiff's disability, therefore, prevented her from working shifts and from taking call, two essential functions of the surgical technologist position.

Plaintiff adduced no evidence of any reasonable accommodation that would have enabled her to perform those essential functions. Based upon the record, the court must conclude that no reasonable jury could find plaintiff was a qualified individual within the meaning of the ADA. Therefore, having examined the evidence in the light most favorable to plaintiff, the court will grant defendant's motion for summary judgment with respect to plaintiff's ADA and PHRA claims for discrimination because plaintiff did not adduce sufficient evidence to meet the second element of those claims.

**B. Failure to accommodate claim**

The ADA provides that an employer discriminates against an employee when it does not "mak[e] reasonable accommodations to the known physical or mental limitations of the individual unless the [employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of the [employer]." 42 U.S.C. § 12112(b)(5)(A). Factors to be considered in determining whether an accommodation would present an "undue hardship" include "the nature and cost of the accommodation . . . the effect on expenses and resources, or the impact otherwise of such accommodation upon the operation of the facility . . . [and] the type of operation or operations of the covered entity, including the composition, structure, and functions of the workforce of such entity." 42 U.S.C. § 12111(10)(B).

To establish a prima facie claim for failure to accommodate under the ADA, a plaintiff must show that (1) she was disabled within the meaning of the ADA; (2) the defendant had notice of her disability; (3) she could perform the essential functions of her position with a reasonable accommodation; and (4) the defendant failed to provide such accommodation. See, e.g., Bolden v. Magee Women's Hosp. of Univ. of Pittsburgh Med. Ctr., No. 2:05-cv-1063, 2007

WL 1228479, *5 (W.D. Pa. Apr. 24, 2007); <u>Johnson v. McGraw-Hill Companies</u>, 451 F.Supp.2d 681, 701 (W.D. Pa. 2006). As discussed above, plaintiff adduced sufficient evidence to meet the first two elements of this claim: she was a disabled person within the meaning of the ADA and defendant had notice of plaintiff's disability through its managers, including Lane, plaintiff's supervisor, and Skundrich, defendant's manager of employee relations.

Plaintiff asserts that she adduced sufficient evidence of the third element because her grievance of August 22, 2005, filed in response to her receiving a three-day suspension, was effectively a request for reasonable accommodation. In the grievance, plaintiff stated: "I would like to believe that working for a Health Institution such as UPMC there would be a grace period with some patients [sic] and compassion." (Miller Dep. Ex. 3.) Viewing this statement in plaintiff's favor as a request for accommodation, plaintiff seems to be requesting that UPMC accommodate her by not counting her absences against her for disciplinary purposes. That kind of accommodation cannot be reasonable in this situation for two reasons.

First, defendant offered evidence that plaintiff's erratic and unpredictable absences posed an undue hardship on the managing of the operating room. Plaintiff asserts that defendant was able to cover for her absences using other, present staff. That defendant was able to cover for plaintiff's absences does not mean that her absences did not pose an undue hardship. Taking into consideration the "type of operation or operations of the covered entity, including the composition, structure, and functions of the workforce of such entity," 42 U.S.C. § 12111(10)(B), it must be acknowledged that plaintiff was a surgical technologist in the operating rooms of a hospital. In this setting, the impact of staffing difficulties is dangerous by reason of the possible adverse effect on patient care.

18

Second, examining the evidence in the light most favorable to plaintiff, her unscheduled absences were related to and a result of her asserted disability. Her unscheduled absences and restriction from taking call prevented plaintiff from fulfilling two essential functions of the surgical technologist position. As plaintiff adduced no evidence of any reasonable accommodation that would have enabled her to perform those essential functions, the court must find that no reasonable jury could conclude that plaintiff met the third element of this claim. Under these circumstances, the court will grant defendant's motion for summary judgment with respect to plaintiff's ADA and PHRA claims for failure to accommodate.

## C. ADA Retaliation claim

Despite the court's finding that no reasonable finder of fact could conclude that plaintiff was a "qualified individual with a disability" under the ADA because plaintiff could not perform the essential functions of her position with or without reasonable accommodation, plaintiff could still pursue a retaliation claim under the ADA. Mondzelewski v. Pathmark Stores, Inc., 162 F.3d 778 (3d Cir. 1998) ("An individual who is adjudged not to be a 'qualified individual with a disability' may still pursue a retaliation claim under the ADA.").

### 1. Prima Facie Case

The court must analyze a retaliation claim under the ADA using the same framework employed for retaliation claims arising under Title VII. Krouse v. American Sterilizer Co., 126 F.3d 494 (3d Cir. 1997) In order to establish a prima facie case of retaliation under the ADA, a plaintiff must show "(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." Id. (citing

Woodson v. Scott Paper Co., 109 F.3d 913, 920 (3d Cir.1997)); LeBoon v. Lancaster Jewish

Cmty. Ctr. Ass'n, 503 F.3d 217, 231-32 (3d Cir. 2007) (citing Moore v. City of Philadelphia, 461

F.3d 331, 341-42 (3d Cir. 2006)); see Burlington Northern & Santa Fe Ry. Co. v. White, 548

U.S. 53 (2006).  In Burlington Northern, the United States Supreme Court held that under the

anti-retaliation provision of Title VII, employer actions are materially adverse if the actions are

"harmful to the point that they could well dissuade a reasonable worker from making or

supporting a charge of discrimination."  Id. at 57.

The first element of the prima facie case requires, at the very least, an informal protest of

discriminatory employment practices.  Barber v. CSX Dist. Services, 68 F.3d 694, 701-02 (3d

Cir. 1995) (citing Summer v. United States Postal Serv., 899 F.2d 203, 209 (2d Cir. 1990)).  In

this case, plaintiff filed a grievance in August 2005 in response to the three-day suspension she

received as discipline for her absences.  Filing a grievance can constitute a protected activity for

purposes of a retaliation claim.  Id.  In December 2005, defendant terminated plaintiff.  Here, the

adverse action in issue – termination – occurred after the protected activity.

The dispute with respect to plaintiff's retaliation claim turns on whether plaintiff can

demonstrate a causal nexus between her protected activity and the adverse action taken by

defendant.  With respect to the existence of a causal link between the employee's protected

activity and the employer's adverse action, two main factors are relevant: (1) timing and/or (2)

evidence of ongoing antagonism.  Abramson v. Wm. Patterson College of N.J., 260 F.3d 265,

288 (3d Cir. 2001) ("Temporal proximity . . . is sufficient to establish the causal link.  [A]

plaintiff can [also] establish a link between his or her protected behavior and subsequent

discharge if the employer engaged in a pattern of antagonism in the intervening period.") (citing Woodson, 109 F.3d at 920-21).

The United States Court of Appeals for the Third Circuit has been somewhat ambivalent with respect to whether timing alone is sufficient to satisfy the causation prong of the prima facie case. Compare Woodson, 109 F.3d at 920-21 (temporal proximity is sufficient to establish the causal link), and Jalil v. Avdel Corp., 873 F.2d 701 (3d Cir. 1989) (causal link established where plaintiff discharged two days following employer's receipt of the plaintiff's EEOC claim), with Quiroga v. Hasbro, Inc., 934 F.2d 497 (3d Cir. 1991) (affirming lower court's determination that the timing of the plaintiff's discharge alone did not raise an inference of retaliation), and Krouse v. American Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997) (causation prong not established on timing alone where nineteen months passed following protected activity and adverse employment action: "Even if timing alone could ever be sufficient to establish a causal link, we believe that the timing of the alleged retaliatory action must be 'unusually suggestive' of retaliatory motive before a causal link will be inferred."). Timing, however, in connection with other types of suggestive evidence, is sufficient to demonstrate the causal link. Farrell v. Planters Lifesavers Co., 206 F.3d 271, 280-81 (3d Cir. 2000). For example, the court of appeals held that timing combined with evidence of vague or inconsistent reasons given by an employer for an employee's termination was sufficient to satisfy the causation prong of the prima facie case. Waddell v. Small Tube Products, Inc., 799 F.2d 69, 73 (3d Cir. 1986); Abramson, 260 F.3d at 289 ("Here, as we found in our discussion of the discrimination claim, [plaintiff] has succeeded in both casting doubt on the reasons [her employer] proffered for her termination, and in

demonstrating that those reasons were vague and inconsistent."); see EEOC v. L.B. Foster Co., 123 F.3d 746, 753-54 (3d Cir. 1997), cert. denied, 522 U.S. 1147 (1998).

In the instant case, the alleged retaliatory adverse action occurred more than three months after the protected activity engaged in by plaintiff, i.e., requesting accommodations on August 22, 2005. Three months between the protected activity and the allegedly adverse act is not "unusually suggestive" of retaliatory animus. See Williams v. Phila. Hous. Auth. Police Dep't., 380 F.3d 751 (3d Cir. 2004) (a two-month lapse between an employee's protected activity and an employer's adverse action, without additional evidence, was not unusually suggestive of retaliatory animus). In order to establish the requisite causal nexus, plaintiff must, therefore, adduce probative evidence of ongoing antagonism or implausibilities in defendant's reasons for terminating her. "We have indicated that the passage of a long period of time between protected activity and an alleged retaliatory action weighs against a finding of a causal link where there is no evidence of retaliatory animus during the intervening period." Shaner v. Synthes, 204 F.3d 494, 505 (3d Cir. 2000) (citing Krouse, 126 F.3d at 503-04) ("Absent evidence of intervening antagonism or retaliatory animus, we conclude that the passage of time [between the filing of plaintiff's charge and the alleged retaliatory action] in this case is conclusive and that [plaintiff] failed to establish a causal link as a matter of law.") (citing Woodson, 109 F.3d at 920-21).

Plaintiff alleges that ongoing antagonism existed because defendant repeatedly asked plaintiff when she would no longer require scheduling restrictions, and that defendant thereby "manifested its hostility" towards plaintiff for needing those restrictions. Plaintiff makes this argument without pointing to any evidence. Plaintiff does not even allege how often these questions were asked. "Although courts are to resolve any doubts as to the existence of genuine

issues of fact against the parties moving for summary judgment, Rule 56(e) does not allow a party resisting the motion to rely merely upon bare assertions, conclusory allegations or suspicions." Fireman's Ins. Co. of Newark, N.J. v. DuFresne, 676 F.2d 965, 969 (3d Cir. 1982).

"Revealing discrepancies in the proffered reasons can also constitute evidence of the causal link." Abramson, 260 F.3d at 289. Plaintiff, however, did not show that defendant was inconsistent in its reason for plaintiff's termination. To the contrary, the record is replete with evidence documenting defendant's consistent position that plaintiff's absences were unsatisfactory. The steady application of defendant's absence and tardiness policy to plaintiff's absences began in November 2004 with plaintiff's first absence, long before plaintiff's request for accommodations in August 2005.

Plaintiff also asserts that defendant deviated from its written procedures in terminating plaintiff in December 2005. It is well established that an employer's failure to follow its own policies can be evidence of discrimination. See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252 (1977); Stewart v. Rutgers Univ., 120 F.3d 426 (3d Cir. 1997); Hampton v. Borough of Tinton Falls Police Dep't, 98 F.3d 107, 113 (3d Cir. 1996); Colgan v. Fischer Scientific Co., 935 F.2d 1407 (3d Cir. 1991) (en banc). "Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role. Substantive departures too may be relevant, particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached." Vill. of Arlington Heights, 429 U.S. at 267-68.

According to defendant's absence and tardiness policy, an employee with a fourth violation of the policy would be suspended for five days, pending termination. This discipline

would be recorded with a conference report. The decision whether to terminate the employee would be based upon a recommendation from that employee's department head, a review of the reason for the absence, and a review of the employee's overall performance. Defendant provided evidence of all three factors being taken into consideration before making the decision to terminate plaintiff. While plaintiff asserts that "*none* of the required considerations were actually done, and, thus, this vital policy was totally ignored" (Plaintiff's Brief in Opposition to Motion for Summary Judgment ("Pl.'s Br.") at 10) (emphasis in original), she points to no evidence in support of this statement. The court concludes that plaintiff failed to show animus or retaliation on the part of defendant. There was no evidence adduced by plaintiff tending to show that plaintiff was treated differently than other employees terminated for absenteeism.

### 2. Burden shifting

In the interest of completing the analysis, the court notes that even if plaintiff had been able to establish a prima facie case, summary judgment on the retaliation claim would still be appropriate. Under the shifting burden of proof framework set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), if plaintiff had established a prima facie case of retaliation, the burden would then have fallen upon defendant to provide some legitimate, nondiscriminatory reason for plaintiff's termination. Simpson v. Kay Jewelers, 142 F.3d 639, 644 n.5 (3d Cir. 1998). The record is replete with evidence supporting defendant's argument that plaintiff was terminated for violating the absence and tardiness policy. Defendant met its burden.

The burden shifted to plaintiff to "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a

motivating or determinative cause of the employer's action." <u>Fuentes v. Perskie</u>, 32 F.3d 759, 764 (3d Cir.1994). To survive summary judgment, plaintiff must submit evidence that allows the factfinder "reasonably to infer that each of the employer's proffered non-discriminatory reasons was either a *post hoc* fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)." <u>Id.</u> (citations omitted). The nonmoving plaintiff is required to "demonstrate such weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact-finder could rationally find them 'unworthy of credence' and hence infer that 'the employer did not act for [the asserted] non-discriminatory reasons.'" <u>Id.</u>

As noted above, the evidence of the record shows that defendant was consistent in the application of its absence and tardiness policy, both before and after plaintiff's protected behavior of August 2005. Plaintiff did not point to any evidence that she was treated differently under this policy compared to defendant's other employees, and as noted above, failed to show evidence of animosity, antagonism, or hostility on the part of defendant. At this point in the <u>McDonnell Douglas</u> framework, even assuming plaintiff had made out a prima facie case for retaliation, plaintiff failed to show a genuine factual dispute with respect to defendant's reason for her termination. Summary judgment must be granted in favor of defendant with respect to plaintiff's retaliation claim.

For the above reasons, having considered the evidence of the record in the light most favorable to plaintiff, the court must grant defendant's motion for summary judgment with respect to plaintiff's ADA and PHRA claims for retaliation.

**D.  The issue of judicial estoppel**

Defendant asserts that, because plaintiff applied for SSDI benefits, she should be estopped from asserting any claims under the ADA.  In her amended complaint, plaintiff alleges that defendant discriminated against her by violating the ADA.  Defendant argues that plaintiff made statements in support of her application for SSDI benefits that estop her from now asserting that she is a qualified individual under the ADA.

In Cleveland v. Policy Management Systems Corp., 526 U.S. 795 (1999), the United States Supreme Court addressed whether an individual who sought SSDI benefits could later be judicially estopped from claiming protected status under the ADA.  There, the plaintiff in her SSDI application certified that she was "disabled" and "unable to work."  Id.  In her ADA action, however, the plaintiff claimed that she could "perform the essential functions" of a job with a reasonable accommodation.  Id. at 798-99.  The defendants argued that the plaintiff was judicially estopped from asserting her ADA claim because statements made in her application for SSDI were contrary to the position she was taking in her ADA claim.

The Court noted that when viewed in their respective contexts "these two seeming divergent statutory contentions are often consistent with each other."  Id. at 797.  The Court held that "pursuit, and receipt, of SSDI benefits does not automatically estop the recipient from pursuing an ADA claim."  Id.  This court need not resolve whether plaintiff should be judicially estopped here because, as discussed above, plaintiff failed to adduce sufficient evidence to establish a prima facie case under the ADA, and, even if she had done so, plaintiff failed to adduce sufficient evidence to show defendant's proffered reason for her termination was pretextual.

**II.  FMLA claims**

**A.  General**

In her complaint, plaintiff asserts that defendant interfered with plaintiff's exercise of her rights under the FMLA and retaliated against her for attempting to exercise her FMLA rights. Defendant counters, arguing that plaintiff was not entitled to FMLA benefits, and that plaintiff was terminated for excessive absenteeism, not for attempting to exercise FMLA rights.

The FMLA was enacted by Congress in 1993, in part to address problems arising from "inadequate job security for employees who have serious health conditions that prevent them from working for temporary periods." 29 U.S.C. § 2601(b)(1). The FMLA was designed to provide a balance between "entitl[ing] employees to take reasonable leave for medical reasons" and "accommodat[ing] the legitimate interests of employers." 29 U.S.C. §§ 2601(b)(1-2); see Callison v. City of Philadelphia, 430 F.3d 117, 119 (3d Cir. 2005) (citing 29 U.S.C. § 2601(b)(1)) (holding that one of "[t]he primary purposes of the FMLA [is] to 'balance the demands of the workplace with the needs of families' . . . "). The FMLA grants eligible employees the right to take up to twelve work weeks of leave during a twelve-month period for any of the following reasons:

> (A) Because of the birth of a son or daughter of the employee and in order to care for such son or daughter.
> (B) Because of the placement of a son or daughter with the employee for adoption or foster care.
> (C) In order to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition.
> (D) Because of a serious health condition that makes the employee unable to perform the functions of the position of such employee.

29 U.S.C. § 2612(a)(1)(A-D). At the end of the leave period, the employee has the right to be restored to her former position or an equivalent position. 29 U.S.C. § 2614(a)(1).

An eligible employee under 29 U.S.C. § 2612(a)(1)(C) or (D) may be entitled to take

FMLA leave intermittently

> on a reduced schedule when medically necessary. The taking of leave
> intermittently or on a reduced leave schedule . . . shall not result in a reduction in
> the total amount of leave to which the employee is entitled . . . beyond the amount
> of leave actually taken.

29 U.S.C. § 2612(b). The phrase "intermittent leave" is defined under the implementing

regulations as "leave taken in separate periods of time due to a single illness or injury, rather than

for one continuous period of time, and may include leave of periods from an hour or more to

several weeks." 29 C.F.R. § 825.800.

## B. FMLA Interference Claim

Under the FMLA, "it shall be unlawful for any employer to interfere with, restrain, or

deny the exercise of or the attempt to exercise, any right provided under this subchapter." 29

U.S.C. § 2615(a)(1). In order for a plaintiff to establish a claim for an interference of FMLA

rights, "the employee only needs to show that he was entitled to benefits under the FMLA and

that he was denied them." Callison, 430 F.3d at 119. It is necessary that the employee have been

denied something to which he was entitled. "Courts have refused to recognize a valid claim for

interference in the absence of any injury." Alfiano v. Merck & Co., 175 F.Supp.2d 792, 794

(E.D. Pa. 2001) (citing Voorhees v. Time Warner Cable Nat'l Div., No. 98-1460, 1999 WL

673062 (E.D. Pa. Aug. 30, 1999); Fry v. First Fidelity Bankcorp., No. 95-6019, 1996 WL 36910

(E.D. Pa. Jan. 30, 1996)). The scope of what constitutes interference is described in the

applicable regulations as follows: "Interfering with the exercise of an employee's rights would

include, for example, not only refusing to authorize FMLA leave, but discouraging an employee

from using such leave." 29 C.F.R. § 825.220(b).

To state a claim for interference under the FMLA, a plaintiff must show that: (1) he or she was an eligible employee under the FMLA; (2) the defendant was an employer subject to the FMLA's requirements; (3) the plaintiff was entitled to FMLA leave; (4) the plaintiff gave notice to the defendant of his or her intention to take FMLA leave; and (5) the plaintiff was denied benefits to which he or she was entitled under the FMLA. <u>Lombardo v. Air Products and Chemicals, Inc.</u>, No. 05-1120, 2006 WL 1892677, *3 (E.D. Pa. July 7, 2006) (citing <u>Weisman v. Buckingham Twp.</u>, No. 04-4719, 2005 U.S. Dist. LEXIS 11696, *11 (E.D. Pa. June 14, 2005)).

Pursuant to FMLA regulations, an employee must give an employer notice that he or she needs to take FMLA leave. 29 C.F.R. § 825.302; <u>Wilson v. Lemington Home for the Aged</u>, 159 F.Supp.2d 186, 191 (W.D. Pa. 2001). If the leave is foreseeable, the employee must provide thirty days' notice. <u>Id.</u> If thirty days' notice is not possible, then notice must be given "as soon as practicable." <u>Id.</u> An employee need not specifically mention the FMLA or assert rights under it to satisfy the notice requirement. 29 C.F.R. § 825.302(c); <u>Wilson</u>, 159 F.Supp.2d at 192. The employee need only state that leave is needed. <u>Id.</u>

In <u>Sommer v. The Vanguard Group</u>, 461 F.3d 397 (3d Cir. 2006), the court noted:

> [T]he FMLA declares it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" in the FMLA. § 261(a)(1). Such a claim is typically referred to as an "interference" claim, and is acknowledged to "set floors for employer conduct." <u>Callison v. City of Philadelphia</u>, 430 F.3d 117, 119 (3d Cir. 2005).

<u>Sommer</u>, 461 F.3d at 399. "After an eligible employee returns from an FMLA leave, the employee is entitled to be returned to his or her former position, or an equivalent one." <u>Conoshenti v. Public Serv. Elec. & Gas Co.</u>, 364 F.3d 135, 141 (3d Cir. 2004) (citing 29 U.S.C. § 2614(a)(1)). "If the employee is unable to perform an essential function of the position because

of a physical or mental condition, including the continuation of a serious health condition, the employee has no right to restoration to another position under the FMLA. . . ." 29 C.F.R. § 825.214(b).  In other words, the FMLA does not require "an employer to provide a reasonable accommodation to an employee to facilitate his return to the same or equivalent position at the conclusion of his medical leave."  Rinehimer v. Centrolift, Inc., 292 F.3d 375, 384 (3d Cir. 2002).

There is no dispute that defendant was an employer subject to the FMLA's requirements and that plaintiff did not receive the benefits of FMLA leave.  The issue is whether sufficient evidence was adduced by plaintiff with respect to the first, third, and fourth elements of a prima facie case for FMLA interference.  Each of these three elements will be addressed.

### 1.  Plaintiff was an FMLA-Eligible Employee During Two Recorded Absences - First Element

An employee must become eligible for FMLA benefits before he or she may claim entitlement to FMLA benefits.  "The term 'eligible employee' means an employee who has been employed (i) for at least 12 months by the employer with respect to whom leave is requested . . . ; and (ii) for at least 1,250 hours of service with such employer during the previous 12-month period."  29 U.S.C. § 2611(2).  Plaintiff did not work 1,250 hours in a 12-month period until August 2005.  Plaintiff, therefore, was only eligible for FMLA leave during her August 17, 2005, and November 17, 2005, absences.  This fact is not disputed.  According to defendant's absence and tardiness policy, plaintiff, who had been absent for ten days of work, was subject to termination when she received a written warning on June 1, 2005.  Even if plaintiff's last two absences were not counted against her, plaintiff still would have been eligible for termination at

the time of her June 1, 2005 written warning.  Under these circumstances, plaintiff failed to

adduce evidence to satisfy the first element of an FMLA interference claim.

### 2. Plaintiff's Entitlement to Take FMLA Leave - Third Element

Eligible employees may take FMLA leave for only the following situations:

> (A) because of the birth of a son or daughter of the employee and in order to care
> for such son or daughter; (B) because of the placement of a son or daughter with
> the employee for adoption or foster care; (C) in order to care for the spouse, or a
> son, daughter, or parent, of the employee, if such spouse, son daughter, or parent
> has a serious health condition; (D) because of a serious health condition that
> makes the employee unable to perform the functions of the position of such
> employee; or (E) because of any qualifying exigency . . . arising out of the fact
> that the spouse, or a son, daughter, or parent of the employee is on active duty . . .
> in the Armed Forces in support of a contingency operation.

29 U.S.C. § 2612(a)(1)(A-E).  The only situation implicated here is the serious health condition

referenced in section (D).

For the purposes of section (D), the FMLA defines a "serious health condition" as "an

illness, injury, impairment, or physical or mental condition that involves (A) inpatient care in a

hospital, hospice, or residential medical facility; or (B) continuing treatment by a health care

provider."  29 U.S.C. § 2611(11).  Plaintiff's Hepatitis C condition required her to have

continuing treatment at least until August 2004.  Thereafter, there is no evidence of record that

she was an inpatient at any kind of facility or that she was continuing treatment by a health care

provider.  Under these circumstances, no reasonable jury could find that at the time of her

absences in issue she had a serious health condition as required to satisfy element three of an

FMLA interference claim.

### 3.  Plaintiff's Failure to Give Notice to Defendant - Fourth Element

Even if plaintiff was entitled to take FMLA leave for her August 17, 2005, and November 17, 2005, absences, she did not give adequate notice to defendant that she would require FMLA leave.  There is nothing in the record to suggest that on these occasions plaintiff's need to absence herself from work was foreseeable.  In such a situation, an employee should give notice to an employer "as soon as practicable," expecting that notice will be given within one or two work days of the employee learning of the need to take leave.  29 C.F.R. § 825.303(a).  When notifying an employer of the need to take leave, an employee need not explicitly invoke the FMLA for FMLA leave to apply.  29 C.F.R. § 825.302(c); Wilson, 159 F.Supp.2d at 192.  It is enough that the employee provide the employer with some reason that would qualify the employee for FMLA leave.  Id.  If it is ambiguous whether an employee will be using FMLA leave, an employer should inquire of the employee for details about whether the employee is actually seeking FMLA leave.  29 C.F.R. § 825.302(c).

When she called off from work, plaintiff gave notice of her absence to defendant within an appropriate time frame.  Plaintiff, however, told defendant nothing which could have put defendant on notice that plaintiff was possibly taking an FMLA-qualifying absence.  When calling off from work, plaintiff did not indicate that her illness was in any way related to Hepatitis C.  Indeed, plaintiff's stated reasons for her two absences – that she felt "ill", and that she felt nauseated, respectively – did not create an investigable ambiguity that plaintiff might have been qualified for FMLA leave on those occasions.  Those complaints did not raise an actionable suspicion on the part of defendant's other employees to query plaintiff further about whether she intended to use FMLA leave.  Moreover, Chopra testified that, at the time plaintiff

32

returned to work in November 2004, it was unlikely that plaintiff would have continued to suffer from side effects of her Hepatitis C.  Under these circumstances, no reasonable jury could find that plaintiff satisfied element four of an FMLA interference claim.

The evidence of the record, examined in the light most favorable to plaintiff, cannot support a claim for interference under the FMLA, and the court must grant defendant's motion for summary judgment with respect to this claim.

## C.  FMLA Retaliation Claim

Plaintiff asserts a claim of retaliation under the FMLA.  An FMLA retaliation claim is contemplated by section 815.220(c) of the regulations implementing 29 U.S.C. § 2615(a).  29 C.F.R. § 825.220(c);[7] see Conoshenti, 364 F.3d at 146 (citing 29 C.F.R. § 825.220(c) and noting that FMLA retaliation claims arise under 29 U.S.C. § 2615(a), the interference provision of the FMLA).  To establish a prima facie case for retaliation under the FMLA, a plaintiff must show that (1) she took an FMLA leave, (2) she suffered an adverse employment decision, and (3) the adverse decision was causally related to her leave.  Conoshenti, 364 F.3d at 146.  Plaintiff did not take an FMLA leave, and did not even attempt to assert her rights to FMLA leave,[8] and so fails to

---

[7] 29 C.F.R. § 825.220(c) provides:

An employer is prohibited from discriminating against employees or prospective employees who have used FMLA leave.  For example, if an employee on leave without pay would otherwise be entitled to full benefits (other than health benefits), the same benefits would be required to be provided to an employee on unpaid FMLA leave.  By the same token, employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions, or disciplinary actions; nor can FMLA leave be countered under "no fault" attendance policies.

[8] Plaintiff requested FMLA leave in May 2005 for the purpose of caring for her mother, but she was informed at that time that she had not worked enough to be eligible for FMLA

meet the first element of a retaliation claim. Plaintiff only became an FMLA-eligible employee in August 2005, and had only two absences from work after that time. During the year prior to those two absences, plaintiff had not received inpatient care in a facility or continuing treatment by a health care provider. Although the record does not indicate why defendant did not terminate plaintiff after she had ten unscheduled absences from work, the record is clear that plaintiff was subject to termination when she failed to report to work for the tenth time within a twelve-month period, i.e., after her April 4, 2005 absence. The court must, therefore, grant defendant's motion for summary judgment with respect to plaintiff's claim for retaliation under the FMLA.

## III.    FLSA, PMWA, and WPCL claims

### A. FLSA claim

The FLSA was enacted, in part, to correct "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers." 29 U.S.C. § 202(a). To that end, the FLSA requires that workers be paid a minimum wage. 29 U.S.C. § 206. While generally this minimum wage must be paid to the employee free and clear as "cash in hand", 29 C.F.R. § 531.35, Congress and the courts have created several exceptions so that, in certain situations, employers may recover through payroll deductions monies owed to them by their employees, effectively paying those employees "cash in hand" of less than the minimum wage.

Among these exceptions is that an employer may recover loans and pay advances made to an employee through payroll deductions. See Brennan v. Veterans Cleaning Service, Inc., 482

---

benefits. Plaintiff did not attempt to take FMLA leave in connection with her own health problems.

F.2d 1362, 1369 (5th Cir. 1973). In <u>Brennan</u>, which plaintiff cites to, the court observed that an employee whose wages are deducted to settle a debt between his employer and himself has not received the benefit of those wages free and clear. <u>Id.</u>, at 1369-70. Even if such a deduction could appear "voluntary" on the part of the employee, the special employer-employee relationship, with the inherently superior bargaining position of the employer, makes that arrangement "inherently suspect". <u>Id.</u>

In the same opinion, however, the court recognized that when an employer is not the employee's creditor, but rather makes a payment to a third party on the employee's behalf and at the employee's direction and with the employee's consent, the employee did receive the benefit of his wages free and clear, and directed their use, although not through the usual Friday paycheck. <u>Id.</u> "The Act does not require inflexibility in the timing of the payment of wages or seek to discourage loans to employees." <u>Id.</u> Such payments to third parties are akin to loans or advances, and would permit the employer to recover the third-party payment through deductions from the employee's future paychecks. <u>Id.</u> The relevant provision of the Code of Federal Regulations provides:

> (c) Under the principles stated in paragraphs (a) and (b) of [29 C.F.R. § 531.40], employers have been permitted to treat as payments to employees for purposes of the Act sums paid at the employees' direction to third persons for the following purposes: . . . insurance premiums (paid to independent insurance companies where the employer is under no obligation to supply the insurance and derives, directly or indirectly, no benefit or profit from it). . .

29 C.F.R. § 531.40(c). <u>See</u> <u>Mathis v. Brown</u>, No. 02-3452, at 4-5 (3d Cir. Feb. 6, 2004) (an employer deducted monies from an employee's paycheck for the purposes of paying the employee's health insurance. "The FLSA permits an employer to offset its federal minimum

wage obligations with such authorized deductions, even if those deductions reduce the employee's cash wages below the statutory minimum.") (citing 29 C.F.R. §§ 531.38, .40).

In the instant matter, defendant was not plaintiff's creditor, but made payments on plaintiff's behalf to plaintiff's health insurer. The monies paid by defendant were enjoyed by plaintiff for her own purposes and their use directly benefitted plaintiff. Defendant was entitled to recover the payments it made for plaintiff through the use of paycheck deductions. Defendant was not restricted by minimum wage requirements because the heath insurance premiums counted as part of plaintiff's net wage. For these reasons, having examined the evidence in the light most favorable to plaintiff, the court concludes that no reasonable jury could render a verdict in favor of plaintiff on this claim and defendant's motion for summary judgment must be granted with respect to plaintiff's claim under the FLSA.

## B. PMWA and WPCL claims

The PMWA was enacted to combat "[t]he evils of unreasonable and unfair wages as they affect some employees employed in the Commonwealth of Pennsylvania" by setting a mandatory minimum wage within the state. 43 PA. CONS. STAT. § 333.101. The WPCL "provides a statutory remedy when the employer breaches a contractual obligation to pay earned wages." Weldon v. Kraft, Inc., 896 F.2d 793, 801 (3d Cir. 1990). Section 3 of the WPCL sets out the basic requirements for the regular payment of employee wages:

> Every employer shall pay all wages, other than fringe benefits and wage supplements, due to his employees on regular paydays designated in advance by the employer. . . . The wages shall be paid in lawful money of the United States or check, except that deductions provided by law, or as authorized by regulation of the Department of Labor and Industry for the convenience of the employee, may be made including deductions of contributions to employee benefit plans which are subject to the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq.

36

43 Pa. Cons. Stat. § 260.3. The relevant provisions for paycheck deductions referred to by

section 3 of the WPCL are as follows:

> The following deductions from wages are authorized for the convenience of
> employes in accordance with the provisions of section 3 of the Wage Payment and
> Collection Law.
>
> . . .
>
> (2) Contributions authorized in writing by employees or under a collective
> bargaining agreement to employee welfare and pension plans not subject to the
> Federal Welfare and Pension Plans Disclosure Act (29 U.S.C. § 301 et seq.).
> These include group insurance plans, hospitalization insurance, life insurance,
> provided such insurance policies are written by companies certified by the
> Pennsylvania Insurance Department, and group hospitalization and medical
> service programs offered by nonprofit hospitalization and medical service
> organizations and medical group plans.

34 Pa. Code § 9.1 (citations omitted).

The requirement that deductions must either be authorized in writing by the employee or

authorized under a collective bargaining agreement to be legitimate is clearly written into the

regulation. Defendant did not provide any evidence that plaintiff gave her authorization through

either of these two mechanisms. Under those circumstances, the court must deny defendant's

motion for summary judgment with regard to plaintiff's claims under the PMWA and WPCL.

### *Conclusion*

After considering the undisputed material facts of record, viewing all disputed facts in the

light most favorable to the nonmoving party, and drawing all reasonable inferences in favor of

the nonmoving party, the motion for summary judgment (Docket No. 23) filed by defendant

UPMC McKeesport, improperly named in the caption, will be **GRANTED IN PART** and

**DENIED IN PART**. The court concludes that plaintiff adduced sufficient evidence with respect

to her claims for violations of the PMWA and WPCL and, therefore, defendant's motion will be

**DENIED** with respect to those claims. Plaintiff, however, did not adduce sufficient evidence for a reasonable fact-finder to render a verdict in favor of plaintiff on her claims under the ADA, PHRA, FMLA, or FLSA and summary judgment will be **GRANTED** in favor of defendant on those claims. Although this court has the power to hear pendent state claims following dismissal of federal claims, the court also has the discretion to refuse to hear the state claim. Pendent jurisdiction is "a doctrine of discretion, not of plaintiff's right." <u>United Mine Workers of America v. Gibbs</u>, 383 U.S. 715, 726 (1966). The supplemental jurisdiction statute specifically provides that:

> (c) The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if:
>
> . . .
>
> (3) the district court has dismissed all claims over which it has original jurisdiction.

28 U.S.C. § 1367. Because the court dismissed all of the federal claims over which it has jurisdiction in this case, the court declines to exercise supplemental jurisdiction over plaintiff's state claims. The state claims are dismissed without prejudice.

By the court,


  /s/ Joy Flowers Conti
Joy Flowers Conti
United States District Judge

DATED: July 10, 2008